Raymond SMITH, Petitioner–Appellant,

v.

Margaret BAGLEY, Warden,
Respondent–Appellee.

No. 14–3413.

United States Court of Appeals,
Sixth Circuit.

March 1, 2016.

Before: McKEAGUE and STRANCH,
Circuit Judges; and HOOD, District
Judge.*

* The Honorable Denise Page Hood, United
States District Judge for the Eastern District
of Michigan, sitting by designation.

## OPINION

HOOD, District Judge.

Petitioner–Appellant Raymond Smith was convicted by a jury on December 5, 1995 for the aggravated murder of Ronald Lally, a witness in a criminal proceeding. The trial court adopted the jury's verdict, imposing a sentence of death. On April 25, 2008, Smith's sentence was commuted by the Ohio trial court to life imprisonment pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), after he was adjudicated intellectually disabled. Meanwhile, Smith had petitioned for federal habeas relief, ultimately asserting ten claims for relief. The district court denied the habeas petition, but certified several issues for appeal. We denied Smith's request to expand the certificate of appealability. Smith asserts three claims of error in this appeal. For the reasons set forth below, the district court's order denying habeas relief is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

On March 8, 1995, Raymond Smith was indicted, charged with capital aggravated murder in connection with the death of Ronald Lally. Lally was a confidential informant for the Elyria Police Department. He was set to testify at an aggravated drug trafficking trial against Smith and his son Danny Smith on January 19, 1994. Lally was found dead in a Cleveland cemetery on the morning of January 19th.

On June 7, 1993, Lally had been wired by police while making a controlled buy of crack cocaine from Smith and his son Danny. In August 1993, Smith and Danny were arrested and charged with aggravated drug trafficking. On September 7, 1993, Danny approached Sandra Williams, Lally's fiancée, in her yard indicating that Lally would feel bad if anything happened to her or Lally's family members.

On September 15, 1993, an Elyria police officer responded to a disturbance call at a restaurant, where he observed Stanley Jalowiec walking away from the area and an upset Lally talking to Danny. Lally approached the police cruiser and told the officer that he was an informant and that Danny and Jalowiec had threatened to kill him. The officer approached Danny, who pointed to Lally saying, "That punk ass bitch ... is going to get his." Lally declined to pursue charges for intimidation. A few months before January 1994, Danny solicited Terry Hopkins to "kill somebody ... because he had informed the police of his doings," but Hopkins declined.

During the evening of January 18, 1994, Jalowiec asked Brian Howington to take him to Lally's apartment, where they smoked crack cocaine. The group went to the house of Howington's aunt, Joann Corrine Fike, around 10:00 p.m. While at the house, Jalowiec received a message on his beeper. Jalowiec then asked Howington if he could borrow his aunt's car, a Chrysler LeBaron convertible. Jalowiec and Lally left the aunt's house in the LeBaron around midnight.

Around 3:00 a.m. on January 19, Sharon Hopkins, Smith and his two sons, Danny and Michael, were in a car driven by Danny. They went past railroad tracks, whereupon Smith and Michael got out of the car and walked to a barn in the woods. Danny drove the car back over the tracks to a parking lot where he parked and

---

1. This summary of the facts is drawn largely from the opinion of the Ohio Supreme Court, *State v. Smith*, 87 Ohio St.3d 424, 424–29, 721 N.E.2d 93 (Ohio 2000), quoted at length in the district court's opinion. R. 135, Opinion at 2–7, Page ID 6612–17; *Smith v. Bagley*, 2014 WL 1340066 at *1–6 (N.D.Ohio, April 3, 2014).

turned the car lights off. A LeBaron convertible went past the parking lot to where Smith and Michael were standing. The LeBaron then drove back over the tracks. Sharon identified the driver of the LeBaron as Jalowiec, with three other people in the vehicle. Danny then drove Sharon to her apartment.

Between 5:00 and 6:00 a.m., Smith and Jalowiec returned the LeBaron to Fike. Howington testified that the car was frozen because it had just been washed. Fike noticed there was blood in the car and that Jalowiec's knuckles were bleeding. Smith and Jalowiec told Fike there had been a fight behind a restaurant the night before.

After daybreak, Terry Hopkins returned to Danny's apartment, where he found Smith with Danny, Michael, and Jalowiec. Hopkins testified that one of them said "they had killed the guy" and "they were bragging about it." Hopkins further testified that they said they had shot the victim, run him over with a car, stepped on him, and stabbed him.

At about 9:55 a.m., Cleveland Police Detective Michael Beaman received a call reporting that a partially clad and bloody male body with no identification had been found on a driveway in a Cleveland cemetery. About two weeks later, Lally's family contacted the coroner's office and identified the victim as Lally. The autopsy revealed that Lally died from a nonfatal bullet wound to the head and blows to the head causing brain injuries and a skull fracture. He had been cut in the neck with a knife. The coroner noted that if Lally was not dead when he was left in the cemetery, exposure to the cold would probably have contributed to his death in combination with his injuries. The time of death was estimated to be between 2:30 and 8:30 a.m. on January 19.

In June 1994, Danny contacted Elyria Police Detective Alan L. Leiby to make a deal on other criminal charges he was facing. Danny indicated that his father, Smith, was involved in the Lally homicide. Leiby and two other detectives interviewed Smith on July 5, 1994 about the Lally murder. After being advised of his *Miranda* rights, Smith made a taped statement describing a struggle at a Cleveland cemetery between himself and Lally, who had a gun. During the struggle, he said, "somehow the gun went off." At that point, the driver of the car in which they had come to the cemetery drove off. Smith said he hid behind a tombstone and then walked out of the cemetery, not knowing of Lally's fate until he read about it in the newspaper. In that interview, Smith did not identify the driver of the car.

On January 11, 1995, Smith gave another taped statement naming the driver of the car as "Stan." Smith was indicted in Lorain County, Ohio on March 8, 1995 and charged with one count of aggravated murder with a firearms specification, in addition to a death penalty specification alleging that Smith purposely killed Lally in order to prevent his testimony as a witness in a separate criminal proceeding. Ohio R.C. § 2929.04(A)(8).[2]

Smith's son Michael was deposed by the prosecutor with permission of the court on June 16, 1995. His testimony was preserved in case he would not be available to testify at his father's trial, which eventually began in November 1995. In the deposition, Michael was subject to cross-examination by counsel for all three separately tried defendants (Smith, Danny and Jalow-

**2.** Danny Smith and Stanley Jalowiec were also charged with Lally's murder in separate indictments. Each defendant was tried separately. Jalowiec's trial began in March 1996. He was found guilty and sentenced to death. Danny's trial followed and he was acquitted.

iec), all three of whom were also present for the deposition. Months later, at a pretrial hearing, two detectives testified that Michael was unavailable for trial. Despite numerous efforts, they had been unable to locate him. The trial court ruled that Michael's deposition could be admitted at trial if Michael was not found at the time of trial.

During the trial, after both parties had rested, the prosecutor informed the trial court that Leiby had spoken to Michael, who was out of state. Michael indicated he was afraid of being arrested for probation violations. The prosecutor had authorized Leiby to tell Michael his travel would be paid for if he were to testify, but no promises were made regarding his probation violations. Leiby relayed the prosecutor's offer to Michael and, thereafter, had not heard from Michael. The trial court ruled that Michael was not available and admitted the deposition transcript.

Michael testified at his deposition that around 2:45 a.m. on January 19, he met his father and brother Danny at a restaurant in Elyria. Smith made a telephone call and the three left the restaurant in Danny's car. Danny dropped off Smith and Michael by the railroad tracks. About twenty to thirty minutes later, Jalowiec drove up in a blue LeBaron with Lally. Michael got in the back seat of the car behind the driver, next to Lally. Smith was in the front passenger seat. They drove around for a little while and Lally eventually admitted that he had set Danny up in a controlled drug buy. At this point, Michael testified, Lally agreed to leave town. Jalowiec drove into East Cleveland to buy more crack cocaine. All four men had been smoking crack during the drive. They ended up in a cemetery in Cleveland.

Michael testified that at the cemetery, Smith got out of the car and forced Lally out with a gun pointed at his face. Mi-

chael heard Smith and Lally exchange words, followed by a gunshot. Michael then heard Lally exclaim, "Oh, you shot me in the head. You shot me in the head." Smith told Michael and Jalowiec to get out of the car. Only Jalowiec got out and helped Smith beat Lally. Michael testified that he heard Smith say the gun was jammed as he asked Jalowiec for a knife. Michael could hear "the thumps, and the smacks and the stomps." Michael testified that Lally pleaded, "I won't tell nobody. Don't kill me. Please don't kill me." Smith and Jalowiec tried to stuff Lally into the trunk of the car, but he would not fit. Smith and Jalowiec got back in the car and tried to back up over Lally's body, but the body stopped the car's movement. After repeating this two or three times, they drove off, leaving Lally in the cemetery. During the drive back to Elyria, Smith took the gun apart, throwing it out the car window piece by piece. Michael was later dropped off at Danny's apartment.

At the end of the deposition, Michael was asked on cross-examination whether he intended to testify at his father's trial. He answered in the affirmative, but he said he had received a threat and believed he was in danger—even though his father, his brother, and Jalowiec were all in jail. The deposition then concluded as follows:

Q [by Thomas Elwell, counsel for Raymond Smith]: Well, they're incarcerated, correct?

A: So they're incarcerated.

Q: Excuse me?

A: They're incarcerated, and—

Q: They're no real threat to you now, are they, yes or no?

A: It's a possibility.

Raymond Smith:—kill—

Mr. Elwell: I have no further questions.

Mr. Rosenbaum [Prosecutor]: I thank you very much.

R. 125–2, Dep. Tr. at 94–95, Page ID 6026–27.

To explain this recorded utterance by Smith, "—kill—," the prosecution had questioned Detective Leiby, who was present at the deposition. He testified that Smith's complete statement was a threat: "I raised the boy, now I got to kill him." To this, the defense responded with a different characterization, by a private investigator who was also present at the deposition: "[Smith] stated, 'That is my son, I raised him,' and then he shrugged his head and shrugged his shoulders, 'and now I am going to kill him?' And I took it as a question."

Blood found in the LeBaron trunk liner was tested; the DNA evidence derived from it was consistent with DNA taken from Lally's body.

After Smith was found guilty and sentenced, he filed a direct appeal of his conviction and sentence, which were affirmed by the Ohio Court of Appeals and the Ohio Supreme Court. *State v. Smith*, No. 96CA006331, 1998 WL 158966 (Ohio Ct. App. March 25, 1998); *State v. Smith*, 87 Ohio St.3d 424, 721 N.E.2d 93 (Ohio 2000). Smith filed three post-conviction petitions. The first post-conviction petition was denied by the trial court, a ruling affirmed by both the Ohio Court of Appeals and the Ohio Supreme Court. *State v. Smith*, 98CA007169, 2000 WL 277912 (Ohio Ct. App. March 15, 2000); *State v. Smith*, 89 Ohio St.3d 1453, 731 N.E.2d 1140 (Ohio 2000)(Table). The second post-conviction petition was dismissed by the trial court, a ruling affirmed by the Ohio Court of Appeals and not accepted for review by the Ohio Supreme Court. *State v. Smith*, 04CA008546, 2005 WL 1225931 (Ohio App. 9 Dist. May 25, 2005); *State v. Smith*, 106 Ohio St.3d 1545, 835 N.E.2d 727 (Ohio 2005)(Table). The third post-conviction review was the claim to vacate the death sentence under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which the trial court granted on April 25, 2008.

Smith filed a petition for writ of habeas corpus in the district court on August 2, 2000. On April 3, 2014, the district court issued a 112–page opinion and order denying the habeas petition. R. 135 Opinion, Page ID 6611–6722. This appeal followed.

## II. ANALYSIS

### A. AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits federal habeas relief for violation of federal constitutional and statutory rights to cases involving state proceedings that "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). If there is no decision from the Supreme Court which clearly establishes that a petitioner is entitled to relief, federal habeas relief is unavailable. *Woods v. Donald*, —— U.S. ——, 135 S.Ct. 1372, 1374, 191 L.Ed.2d 464 (2015). This standard is a high bar, requiring a habeas petitioner to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Federal habeas review "exists as a guard against extreme mal-

functions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* (quoting *Harrington,* 562 U.S. at 102–03, 131 S.Ct. 770).

In a federal habeas appeal, "we review de novo the district court's conclusions on issues of law and on mixed questions of law and fact and review its factual findings for clear error." *Montgomery v. Bobby,* 654 F.3d 668, 676 (6th Cir.2011) (en banc) (italics omitted).

## B. Confrontation Clause

Smith's first certified claim in this appeal is that the trial court's admission of Michael's deposition testimony violated his right to confront a witness. The Warden responds that Smith was not deprived of his constitutional right to confront the witness since Michael's testimony at his deposition was subject to cross-examination by counsel for each defendant.

The Sixth Amendment's Confrontation Clause provides that in "criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). For purposes of our review under AEDPA, the clearly established federal law at the time Smith's Confrontation Clause claim was decided by the Ohio Supreme Court in 2000 was defined by *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Under *Roberts,* there is a two-pronged approach to determining the admissibility of prior testimony. First, the "prosecution must either produce, or demonstrate the unavailability of,

the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100 S.Ct. 2531. Second, once a witness is shown to be unavailable, the testimony is only admissible if "marked with such trustworthiness that there is no material departure from the reason of the general rule[,]" and if shown to have "particularized guarantees of trustworthiness." *Id.* at 65–66, 100 S.Ct. 2531 (internal quotation marks omitted). This means that the declarant's statement is admissible only if it bears adequate "indicia of reliability." *Id.* at 66, 100 S.Ct. 2531.

Ohio's Criminal Rule 15 prescribes the manner in which depositions are conducted, with the prosecution and the defense having the right to fully examine a witness. Ohio Crim. R. 15(E). Under Rule 15(F), as it existed when Smith was tried, the deposition could be used at trial if a witness was out of the state, "unless it appears that the absence of the witness was procured by the party offering the deposition." Ohio Crim. R. 15(F).

The Ohio Supreme Court found that the testimony indicated Michael was out of the state and that reasonable efforts by the state to make him available to testify at trial were unsuccessful. *Smith,* 87 Ohio St.3d at 431, 721 N.E.2d 93. The court noted that the record indicated the state continued to seek Michael's live testimony at trial up to the time when the case was submitted to the jury. *Id.* at 431–32, 721 N.E.2d 93. The court found that "[t]here is no evidence that the state was responsible for or procured Michael's absence from Ohio. Rather, the record shows that Michael made himself unavailable because he felt that this life was in danger." *Id.* The court held that the trial court did not abuse its discretion in admitting the deposition into evidence in light of Michael's unavailability to testify under Rule 15(F). *Id.* The court ruled that Smith's right to

confront his accuser was not violated by introduction of the deposition transcript inasmuch as Smith's defense counsel cross-examined Michael during the deposition. *Id.*

On appeal, Smith does not directly challenge the first-prong determination that Michael was adequately shown to be unavailable. Indeed, the district court correctly held that the state courts' conclusion that Michael was unavailable and that the prosecution was not responsible for Michael's absence from the state is neither contrary to, nor involved an unreasonable application of, clearly established federal law. The primary thrust of Smith's claim is that the district court erred in its second-prong "indicia of reliability" assessment.

The Confrontation Clause guarantees an *opportunity* for effective cross-examination. *United States v. Owens*, 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). Smith's counsel had an opportunity to and did cross-examine Michael at his deposition. All of Smith's various arguments attacking the reliability of Michael's deposition testimony fail to establish Michael's statements lacked adequate "indicia of reliability." The district court's opinion properly addressed the arguments raised by Smith. R. 135, Opinion at 59–70, Page ID 6669–80. Based on that analysis, we find no error in the district court's holding that Smith is not entitled to habeas relief on his Confrontation Clause claim.

## C. Prosecutorial Misconduct

Smith next argues that Michael's unavailability to testify at trial was the product of prosecutorial misconduct. He insists that the prosecutor did in fact procure Michael's absence from the state. He offered the affidavit of Ditanvia Geiger dated January 14, 1997, attesting to the fact that Michael told her that the assistant county prosecutor and Detective Leiby "sent him to the State of Arizona prior to the trial of Raymond Smith." R. 122–7, Geiger Aff., Page ID 2615. The trial court recognized that the late discovered Geiger affidavit was new evidence outside the record, arguably constituting cause for Smith's failure to present it earlier in support of the Confrontation Clause claim. However, the court denied relief for lack of a showing that Smith was prejudiced by presentation of the deposition testimony. That is, Smith had presented no evidence to support a finding that Michael's testimony would have been materially different if he had given live testimony. The court noted that Michael was subject to cross-examination in the deposition by Smith's counsel. The trial court denied an evidentiary hearing and denied relief. R. 122–8, Findings of Fact and Conclusions of Law at 10–11, Page ID 2748–49.

The Ohio Court of Appeals, the last court to expressly address this issue, affirmed, holding that the claim was barred under Ohio's doctrine of res judicata. In the process, however, the court of appeals observed that Smith "did not attempt to support any of his claims with evidence *de hors* the record." *State v. Smith*, 2000 WL 277912 at *1 (Ohio App. 9 Dist., March 15, 2000). The court expressly noted that although Smith had referred to evidentiary support for his claim, the court had been "unable to find any such evidence in the record." *Id.* at *1 n. 1.

The district court held that the Ohio Court of Appeals' reliance on res judicata to deny relief rendered Smith's Geiger-affidavit-based claim procedurally defaulted, barring federal habeas review of the merits of the claim. That the Ohio Court of Appeals may not have actually had the Geiger affidavit before it made no differ-

ence, the district court explained, because "Ms. Geiger's affidavit would not have materially changed the case that could have been presented on direct appeal." R. 135, Opinion at 87, Page ID 6697.

We have recognized that the Ohio courts' application of res judicata to bar review of the merits of a post-conviction claim is an adequate and independent ground precluding federal courts from reviewing the merits of the claim in a habeas proceeding. *See Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir.2007). Ohio courts routinely apply the res judicata rule to bar claims presented in a post-conviction proceeding that could have been raised at trial or on direct appeal but were not. *State v. Cole*, 2 Ohio St.3d 112, 113, 443 N.E.2d 169 (1982). An exception to the res judicata doctrine is recognized when a petitioner presents evidence outside the record to support a claim in a post-conviction proceeding. *State v. Smith*, 17 Ohio St.3d 98, 101, 477 N.E.2d 1128 (1985). Ohio courts have limited this "new evidence" exception to evidence that demonstrates a defendant could not have appealed the constitutional claim based on the information in the original record. *State v. Lawson*, 103 Ohio App.3d 307, 315, 659 N.E.2d 362 (Ohio Ct.App.1995).

When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is barred unless petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). If a petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). However, in an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986).

The Ohio courts clearly and expressly relied on Ohio's res judicata doctrine in denying Smith's request for an evidentiary hearing or other relief based on the Geiger affidavit. The district court held that even if the Geiger affidavit constitutes "some" evidence outside the record, the affidavit is not clear and convincing evidence that the Ohio Supreme Court was wrong, on direct appeal, in its assessment of the state's representations regarding Michael's unavailability for trial. R. 135, Opinion at 90–91, Page ID 6700–01. As noted above, the Ohio Supreme Court examined the issues surrounding Michael's unavailability and admission of the deposition transcript and found that the prosecution had acted in good faith and that Michael had made himself unavailable because he feared for his safety.

In *Gumm v. Mitchell*, 775 F.3d 345 (6th Cir.2014), we found that where denial of a prosecutorial misconduct claim was based on the state courts' evaluation of the state's evidentiary rule, "it is difficult to say ... that no reasonable jurist could agree with the Ohio court's conclusion that the prosecutor's conduct did not violate [p]etitioner's due process rights." *Id.* at 380. We concluded that a petitioner is not entitled to habeas relief based solely on an alleged violation of a state evidentiary rule that the state courts allowed. Here, the trial court, affirmed by the Ohio Supreme Court, made a finding that Michael was unavailable under Ohio Criminal Rule 15, as addressed above. Insofar as the state

courts' decision to admit Michael's deposition testimony was based on application of a state evidentiary rule, Smith's argument that the courts allowed prosecutorial misconduct does not make out a due process violation cognizable in habeas review. *Id.* at 380 ("[E]valuation of a state's decision on its evidentiary rule is 'no part of a federal court's habeas review of a state conviction.)'" (quoting *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (2012)).

Smith contends that, to the extent the Ohio Court of Appeals invoked res judicata without considering the Geiger affidavit, the claim is essentially unexhausted. He asks us to remand for full consideration by the state courts before finally deciding his habeas claim. Even if we were to consider the claim "unexhausted," we may, in an appropriate case, reach the merits and deny the unexhausted claim. *See* 28 U.S.C. § 2254(b)(2); *Hanna v. Ishee*, 694 F.3d 596, 610 (6th Cir.2012). This is an appropriate case.

■ Even if the Geiger affidavit were considered and credited, evidence that the prosecution had facilitated Michael's departure from the state for safekeeping *prior* to Raymond Smith's trial would not represent clear and convincing evidence that the prosecution procured his unavailability at the time of trial. As the district court noted, Geiger's otherwise unsupported affidavit, recounting a hearsay statement, is not sufficiently weighty to rebut the factual basis for the state courts' unavailability finding. If Smith were deemed to have demonstrated cause for his failure to earlier assert the Geiger affidavit, he has not carried his burden of showing such actual prejudice as is needed to overcome the procedural default.

On de novo review, we find no error in the district court's denial of relief on this claim. Smith has not shown that the Ohio courts' ruling on this claim was so lacking in justification or resulted in the conviction of one who is actually innocent. Smith is not entitled to habeas relief on this issue.

## D. Withheld Evidence

Smith's final claim is also premised on the Geiger affidavit, but couched as a *Brady* claim. He contends that the Geiger affidavit represents evidence supporting his claim that the prosecution suppressed information about its knowledge of Michael's whereabouts at the time of Smith's trial. The *Brady* claim was presented in Smith's second petition for post-conviction relief. The trial court dismissed the petition as time-barred under Ohio R.C. § 2953.21(A), because Smith had not shown cause for not raising the claim on direct appeal or in his first petition for post-conviction relief. The Ohio Court of Appeals affirmed and the Ohio Supreme Court declined discretionary review. The district court denied relief, holding that Smith has not shown cause or prejudice in avoidance of the procedural default.

"[T]he suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Strickler v. Greene*, 527 U.S. 263, 288, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Before addressing the merits of the *Brady* claim, however, we must first determine whether petitioner established cause and prejudice to excuse his procedural default. *Strickler*, 527 U.S. at 282, 119 S.Ct. 1936.

■ Smith's *Brady* claim falls short on several fronts. First, Smith makes no showing of "cause" for his failure to assert the claim in his first petition for post-

conviction relief, when other claims premised on the Geiger affidavit were asserted. This failure alone is dispositive of the claim. Nor has Smith shown that the Geiger affidavit itself was ever in the prosecution's possession or control and was suppressed. Further, the Geiger affidavit is not material to Smith's guilt or innocence. Its supposed "materiality" resides in its usefulness to impeach testimony, unrelated to Smith's guilt or innocence, but related only to representations made by the prosecution team regarding Michael's unavailability. Even in this limited respect, as explained by the district court, the unavailability of the Geiger affidavit did not result in such "prejudice" as to undermine the integrity of the Ohio Supreme Court's finding that Michael was adequately shown to be unavailable for trial to justify admission of his deposition transcript. Smith failed to show both cause and prejudice needed to overcome his procedural default.

Accordingly, we find no error in the district court's ruling that Smith's Geiger-affidavit-based *Brady* claim is procedurally defaulted. It follows that this *Brady* claim presents no cognizable grounds for habeas relief.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's order denying Smith's habeas petition.