*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0185p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

STANLEY FITZPATRICK,

        *Petitioner-Appellant,*

    *v.*

NORM ROBINSON, Warden,

        *Respondent-Appellee.*

No. 09-4515

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:06-cv-356—Susan J. Dlott, Chief District Judge.

Argued: May 1, 2013

Decided and Filed: July 19, 2013

Before: CLAY, McKEAGUE, and KETHLEDGE, Circuit Judges.

—————————

## COUNSEL

—————————

**ARGUED:** Mark A. Vander Laan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellant. David M. Henry, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Mark A. Vander Laan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, James Schuster, Cincinnati, Ohio, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

—————————

## OPINION

—————————

CLAY, Circuit Judge. In June 2001, Petitioner Stanley Fitzpatrick murdered three people, including his girlfriend and his girlfriend's twelve-year old daughter. During the opening stages of his capital trial in Hamilton County, Ohio, Petitioner demanded that he be allowed to plead guilty to the charges. After inquiries into his mental state were made, a state court accepted his plea, and shortly thereafter, a three-

judge panel sentenced him to death.  Ohio courts affirmed Petitioner's convictions and sentence, and denied him state postconviction relief.  Petitioner now appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254.  For the following reasons, we **AFFIRM** the district court's denial of Petitioner's petition for a writ of habeas corpus.

## BACKGROUND

Petitioner Stanley Fitzpatrick pleaded guilty to the 2001 murders of his girlfriend, his girlfriend's twelve-year old daughter, and a neighbor.  The facts underlying his crimes are undisputed and, having been adequately laid out by the Ohio Supreme Court in Petitioner's direct appeal, *State v. Fitzpatrick*, 810 N.E.2d 927, 930–32 (Ohio 2004), need not be repeated here since they do not bear on the issues we are asked to consider. More relevant for our review are the circumstances surrounding Petitioner's guilty plea and the sentencing phase of his state trial.

### State Trial Proceedings

From very early on in this case, there were questions about Petitioner's mental health.  At a pretrial hearing on July 16, 2011 (about one month after Petitioner was indicted), the trial court  took up the issue of Petitioner's competence.  It did so because of Petitioner's confession to his cousin during which Petitioner stated that the devil had made him commit the crimes.  However, based on the representation of the lead investigator that neither he nor other officers had any concerns about Petitioner's competence, the trial court took no action at that time.  Similarly concerned with Petitioner's mental state, Petitioner's trial counsel (Steven Wenke and Thomas Cutcher), on September 5, 2011, moved the trial court for the appointment of a psychiatrist, Dr. Emmett Cooper, which the trial court granted.[1]  Additionally, two weeks prior to trial, Petitioner's trial counsel obtained the mental health records from the jail where Petitioner had been held for the eight months preceding the trial.

---

[1] At the same time, Petitioner's trial counsel moved for the appointment of a mitigation specialist, James Crates, which was also granted.

Petitioner's trial began on February 5, 2002. After the jury was empaneled, the prosecutor gave his opening statement, followed by Wenke's opening statement on behalf of Petitioner. At the conclusion of opening statements, however, something unexpected occurred. Cutcher requested a sidebar to inform the trial court about statements Petitioner had made to Cutcher during Wenke's opening. During the sidebar, Cutcher told the court that Petitioner had indicated his desire to plead guilty and that while Cutcher recommended against such action, Petitioner "told [Cutcher] that if [Cutcher] didn't stop this proceeding, that [Petitioner] would." (Pet'r App. at p. 441.) The trial court explained that it was disinclined to "entertain" a guilty plea "at that time" but advised that if Petitioner wanted to "give it some more consideration," Petitioner should talk further with counsel, then after the lunch break or the next day, the trial court would "certainly listen to what [Petitioner] ha[d] to say." (*Id.*)

The trial court then adjourned the sidebar and advised Petitioner in open court, but without the jury present, of its disinclination to accept a guilty plea at that time. Petitioner, however, insisted that he wanted to plead guilty right then and did not want "to wait till no lunch or the next day or nothing." (*Id.* at 445.) He told the trial court to "just make it over with, man" and not "put his family through this." (*Id.* at 446.) The trial court responded, "I understand what you're saying, okay. I do disagree with you at this point. I'm telling you right now, that we're going to proceed, at least at this juncture." (*Id.*) At this point, Petitioner interrupted the trial court and demanded to be taken out of the courtroom and reiterated that he wanted to stop the trial. Wenke then suggested a recess, which the trial court agreed to take.

Following the recess, Wenke relayed to the trial court Petitioner's continued desire to withdraw his not guilty plea and enter a guilty plea. Because Wenke "d[id] not see any issues with regard to [Petitioner's] competency," he asked that the trial court proceed to take Petitioner's guilty plea. (*Id.* at 453.) Wenke then made mention of a potential court-ordered competency examination under *State v. Ashworth*, 706 N.E.2d 1231 (Ohio 1999), and the trial court sought to clarify whether Wenke was requesting such an examination. In response, Wenke stated that he did not see any issue with

Petitioner's competency, and because of that and Petitioner's clear desire to plead guilty, Wenke felt "bound" to honor Petitioner's wish to plead guilty. (*Id.* at 454.) Wenke again suggested the possibility of an *Ashworth* examination despite his personal feeling that Petitioner was competent. Finally, when asked directly by the trial court whether he was asking the trial court to conduct a competency hearing, Wenke answered that he was not. No competency examination was ordered at that time.

Before the jury was brought back in, Wenke again presented Petitioner's request not to be present in the courtroom. The trial court asked Petitioner a series of questions through which Petitioner agreed that he wanted to be taken out of the courtroom, despite acknowledging that the trial court and Petitioner's counsel recommended against such a course, stating that he would be "disruptive" and might "jeopardize the safety of the participants in the trial as well as the deputies." (*Id.* at 463–64.) Based on Petitioner's responses, the trial court excused Petitioner. The trial court then broke for lunch.

After lunch, the trial court again took up the issue of Petitioner's mental state, without Petitioner present. Wenke suggested that because of his client's desire to plead guilty, "the next step would be to put a jury waiver on and then proceed from there." (*Id.* at 474.) Wenke again asserted that he did not think that Petitioner was incompetent, stating that his belief was "based on conversations I have had with Dr. Emmett Cooper, as of approximately 9:30 last night. Also conversations I have had with Dr. [James] Hawkins, and also reviewing medical records from Dr. [Neal] Dunsieth and Dr. [Michael] Newton, who are all psychiatrists. In addition, I have had discussions with Dr. Bob Tureen, who is a psychologist." (*Id.* at 474–75.) The prosecutor also represented to the trial court that, based on, among other things, his "conversations with the sheriff's department, . . . there's no indication [that Petitioner is] incompetent." (*Id.* at 477.) The trial court then concluded that Petitioner should be returned to the courtroom so that the trial court could confirm that Petitioner indeed wished to waive his right to a jury and plead guilty and that those decisions were "made knowingly, intelligently, and voluntarily." (*Id.* at 478.)

Petitioner was brought back into court, and his desire to waive his right to a jury was probed. Petitioner acknowledged that he had reviewed the jury waiver form and had signed it with the desire to waive his right to a jury and to have the case tried by a three-judge panel, as required by Ohio law. Additionally, the trial court questioned Petitioner about the medications he was taking. Petitioner told the court that his medication did not prevent him from understanding the proceedings, nor did it interfere with his thinking. The trial court then accepted Petitioner's jury waiver.

Pursuant to the trial court's acceptance of Petitioner's jury waiver and Ohio Rev. Code § 2945.06, a three-judge panel was convened on February 8, 2002. The panel was presented with the guilty plea form, drafted by Petitioner's trial counsel wherein Petitioner acknowledged waiving his right to a jury, that a three-judge panel would still hear the state's evidence on the capital charges, and that it was his wish to plead guilty. Also contained in the plea form was a statement signed by Petitioner's counsel and the state prosecutors which states that they informed Petitioner of the rights he was waiving and that in their opinion, Petitioner "is competent to enter this plea and now does so knowingly, intelligently and voluntarily." (Resp't App. at p. 1354.) During the plea hearing, the three-judge panel walked through the plea and its consequences with Petitioner, including that the state would still put on evidence of his guilt, that the three-judge panel would conduct the sentencing, and that a jury would no longer be involved in his case.

The three judges then turned once again to the issue of Petitioner's mental health. The panel questioned Petitioner about the medications he was taking. Petitioner stated, in response to the court's questions, that the medications were helping, not hurting him, and that they "stopped [him] from hearings voice [sic] and seeing things." (Pet'r App. at p. 549) When the judges asked whether the medication affected his ability to understand the proceedings, Petitioner responded, "No." (*Id*. at 552.) Satisfied that the medications were not adversely affecting Petitioner, the three-judge panel allowed Petitioner to enter his plea of guilty, which was then followed by the state putting on evidence of Petitioner's guilt, as required by Ohio Rule of Criminal Procedure 11(C)(3).

The court recessed, and on February 11, 2002, the three-judge panel accepted Petitioner's guilty plea and found him guilty of all charges.

Having found Petitioner guilty, the state court began the sentencing phase of the trial. In laying out what the mitigation case would be on Petitioner's behalf, his trial counsel stated, "We only have three witnesses. . . . We have had substantial discussion with [Petitioner] this weekend, and he's given us instructions with regard to his family members. He did not want them called." (*Id*. at 710.) The three witnesses called on Petitioner's behalf were the investigating officer, Detective Pat Dilbert; a co-worker, Eric Mitchell; and the court-appointed psychiatrist, Dr. Cooper. The focus of Petitioner's trial counsel's argument against the imposition of the death penalty was on the mitigating factor laid out in Ohio Revised Code § 2929.04(B)(3)—that Petitioner, "because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of [his] conduct . . . ." (*See id*. at 923.) On this point, Petitioner's trial counsel elicited testimony from the investigating officer that Petitioner, in his confession to his cousin, had mentioned hallucinations about the devil, as well as testimony about Petitioner's "crack binge" that led up to the murders. (*Id*. at 724) Petitioner's trial counsel elicited consistent testimony from Petitioner's co-worker about Petitioner's use of crack cocaine and hallucinations about the devil. Petitioner's trial counsel discussed Petitioner's mental health generally with Dr. Cooper, who testified about his evaluations of Petitioner as well as the numerous medications that Petitioner had been prescribed. Dr. Cooper's conclusion was that the murders were a result of Petitioner's "substance-induced psychotic disorder." (*Id*. at 777.) The three-judge panel, however, eventually sentenced Petitioner to death, finding that, in Petitioner's case, the aggravating circumstances outweighed the mitigating ones.

_State Appeals and Post-Conviction Proceedings_

Petitioner appealed both his convictions and sentence to the Ohio Supreme Court, which affirmed the convictions and sentences. *Fitzpatrick*, 810 N.E.2d at 946. One issue that the Ohio Supreme Court addressed on direct appeal was whether Petitioner had knowingly and voluntarily entered his jury waiver and guilty plea. *Id*. at 936–38.

On this issue, the Ohio Supreme Court found that Petitioner's written plea agreement and plea colloquy, including "express representations by [Petitioner] and his counsel that the natures of the charges had been explained to him and that [Petitioner] understood them," demonstrated that his decision to plead guilty and waive his right to a jury were knowing and voluntary. *See id*. at 937–38.

Following Petitioner's direct appeals, on November 22, 2002, Petitioner filed for state post-conviction relief in the Hamilton County Court of Common Pleas, asserting fourteen grounds for relief. Relevant to this appeal, among the fourteen grounds for relief were claims that Petitioner's trial counsel were ineffective and claims about Petitioner's entry of his jury waiver and guilty plea. *See generally State v. Fitzpatrick*, No. C-030804, 2004 WL 2367987 (Ohio Ct. App. Oct. 22, 2004). Petitioner supported his claims with the introduction of evidence from outside the record. Specifically, Petitioner attached fourteen exhibits to his state post-conviction petition, including jail records concerning his medication and behavior while in pretrial custody, employment records, articles about addiction, testimony about addiction from an unrelated case, information about stun belts and the sheriff department's stun belt policy, the three-judge panel's sentencing opinion, an affidavit by an attorney specializing in capital litigation, documents about Petitioner's mitigation specialist James Crates' involvement at trial, and an affidavit about the use of mitigation specialists.

The state post-conviction court denied Petitioner relief on all claims without oral argument or an evidentiary hearing. Petitioner then appealed to the Ohio Court of Appeals. *See Fitzpatrick*, 2004 WL 2367987. The court of appeals declined to reach Petitioner's claims about his jury waiver and guilty plea because it found those claims barred by res judicata because they had been addressed by the Ohio Supreme Court on direct appeal. *See id*. at *5, 8. It did, however, reach the merits of Petitioner's associated ineffective assistance of counsel at trial claims, that is, his trial counsel were ineffective for failing to insist on a competency hearing, and rejected those claims. *See id*. at *8. The Ohio Court of Appeals also rejected Petitioner's ineffective assistance of counsel at sentencing claims on the merits. *Id*. at *11–12. Subsequently, the Ohio

Supreme Court declined to review Petitioner's post-conviction case. *State v. Fitzpatrick*, 825 N.E.2d 623 (Ohio 2005).

*Federal Habeas Proceedings*

In June 2006, Petitioner filed his petition for a writ of habeas corpus under 28 U.S.C. § 2254(d) in the United States District Court for the Southern District of Ohio, raising ten grounds for relief.[2]  Relevant for our purposes, Petitioner argued that (1) his counsel were ineffective during (a) his trial and (b) his sentencing and that (2) he did not knowingly and voluntarily waive his right to a jury and enter into his guilty plea. Pursuant to 28 U.S.C. § 2254(e)(2), the district court held an evidentiary hearing with respect to Petitioner's ineffective assistance claims on October 29 and 30, 2007.

At that hearing, Petitioner's habeas counsel introduced an affidavit from neuropsychologist Dr. Tureen.  In his affidavit, Dr. Tureen stated that he evaluated Petitioner at the request of Petitioner's trial counsel, and the evaluation included an IQ test, on which Petitioner scored a 69, which is indicative of borderline mild mental retardation. *See* Am. Psychological Ass'n, Diagnostic and Statistical Manual of Mental Disorders 41–42 (4th rev. ed. 2000).  He explained that these results suggested that Petitioner would have had substantial difficulty or would have been unable to validly waive his rights.  Finally, Dr. Tureen noted that he had offered to provide Petitioner's trial counsel with the results of the IQ test but that Petitioner's trial counsel had refused to learn about the results.

Petitioner next put on Dr. Dunseith, the jail psychologist who worked with Petitioner.  Dr. Dunseith testified that while he initially believed that Petitioner was malingering, he later concluded Petitioner's symptoms were genuine.  He noted that Petitioner appeared anxious and depressed, and diagnosed him as having an adjustment disorder with symptoms similar to post-traumatic stress disorder.  He also testified that, contrary to Petitioner's trial counsel's representation, Petitioner was on four medications (Trazodone, Benadryl, Ativan, and Seroquel) at the time of his trial.

---

[2]He has abandoned most of these grounds before our Court.

A third psychologist, Dr. Cooper, testified about Petitioner's mental state around the time of the trial. Dr. Cooper described the effects of the prescription cocktail that Petitioner had been on, noting that Trazodone was an antidepressant and sleep aid and would be extremely sedating at the dose taken; that Benadryl is used as a sleep aid and would increase the sedation effect of Trazodone; that Ativan is an anti-anxiety, muscle relaxant, and anti-convulsant that is sedating and can impair short-term memory; and that Seroquel is an antipsychotic that is used to treat mood and thought disorders. Dr. Cooper opined that it might have made sense to have had Petitioner examined for competency. Further, despite never having been specifically asked to evaluate Petitioner's competency, Dr. Cooper expressed skepticism that Petitioner had the requisite mental capacity to waive his rights, in view of his organic brain damage, depression, psychosis, and psychotropic medications.

After weighing the new testimony, the district court accepted the magistrate judge's recommendation to deny Petitioner's request for habeas corpus. *Fitzpatrick v. Bradshaw*, No. 1:06-cv-356, 2009 WL 3734143, at *1 (S.D. Ohio Nov. 5, 2009). The district court found that the state "trial court's determination that Fitzpatrick's plea was intelligent, knowing, and voluntary is fairly supported by the record," *id*. at *18, and that the state court's decision with respect to Petitioner's jury waiver was "neither unreasonable nor contrary in its application of federal law," *id*. at *21. The district court also found that Petitioner's trial counsel did not perform ineffectively during at the trial, *id*. at *29–31, or at sentencing, *id.* at *33–36. The district court did, however, issue Petitioner a certificate of appealability. *See Fitzpatrick v. Bradshaw*, No. 1:06-cv-356, 2010 WL 2761578 (S.D. Ohio July 13, 2010).

**STANDARD AND SCOPE OF REVIEW**

On appeal of a denial of a petition for a writ of habeas corpus, we review the district court's conclusions of law *de novo* and its factual findings for clear error. *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012). Such review is, however, subject to the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). *Id*. Under 28 U.S.C. § 2254(d), a petitioner

may not obtain federal habeas corpus relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court's decision is "contrary to . . . clearly established Federal law"[3] if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law [or] . . . confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite result]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *accord Hanna*, 694 F.3d at 605. A state court decision is "an unreasonable application of [clearly established federal law]" if it either "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or makes an unreasonable determination as to whether or not to extend a legal principle from the Supreme Court's precedent to a new context. *Williams*, 529 U.S. at 407.

The Supreme Court has explained that "[f]or purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 785 (2011) (emphasis in original) (internal quotation marks omitted). Further, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id*. at 786 (internal quotation marks omitted). This deference reflects the view that § 2254 is only to be used to "guard against extreme malfunctions in the state criminal justice systems." *Id*. (internal quotation marks omitted).

---

[3]The Supreme Court has made clear that the relevant "clearly established Federal law" is the holdings of the Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

In addition to limiting the scope of our review, AEDPA encompasses an evidentiary limitation on federal habeas review. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011); *see Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013). "Thus, even if a petitioner was granted an evidentiary hearing pursuant to § 2254(e), the federal court must disregard newly obtained evidence that supports a claim that was previously adjudicated on the merits before the state court." *Hanna*, 694 F.3d at 606. *Pinholster*'s evidentiary limitation reflects the view that "§ 2254(d)(1) review focuses on what a state court knew and did." 131 S. Ct. at 1399.

## DISCUSSION

## I.        Ineffective Assistance of Counsel

Petitioner asserts that his counsel were ineffective both at his trial and at sentencing. We will evaluate Petitioner's trial counsel's representation at each stage individually.

Claims alleging ineffective assistance of counsel are governed under the familiar performance-and-prejudice test from *Strickland v. Washington*, 466 U.S. 668 (1984). To establish deficient performance under *Strickland*, Petitioner "must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 688); *accord Lafler v. Cooper*, __ U.S. __, 132 S. Ct. 1376, 1384 (2012). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689). Petitioner bears the burden of showing that counsel made errors "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Richter*, 131 S. Ct. at 787 (internal quotation marks omitted).

"To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Cooper*, 132 S. Ct. at 1384 (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). In the guilty-plea context, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Cooper*, 132 S. Ct. at 1384–85. In the context of a mitigation proceeding, the inquiry is "whether a reasonable probability exists that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

With respect to how AEDPA's standard of review interacts with *Strickland*'s performance-and-prejudice test, the Supreme Court's decision in *Harrington v. Richter* is instructive:

> Surmounting *Strickland*'s high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. . . .

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. . . . [T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 131 S. Ct. at 788 (citations and internal quotation marks omitted).

## A.    Trial

Petitioner argues that his counsel were ineffective at trial because they failed to adequately inform themselves and the trial court about Petitioner's mental impairments. In evaluating this claim on state post-conviction review, the Ohio Court of Appeals considered both the transcript of Petitioner's trial and the additional evidence submitted

with Petitioner's state post-conviction filing. *See Fitzpatrick*, 2004 WL 2367987, at *8. After doing so, it concluded,

> The record of the proceedings at trial confirmed defense counsel's need for substantial preparation time and disclosed rational reasons for Fitzpatrick's waiver of a trial before a jury. Nothing in the outside evidence offered in support of [these] claims demonstrated a reasonable probability that, but for counsel's failure to insist on, or to secure, a competency hearing, Fitzpatrick would not have waived his speedy-trial or jury rights or pleaded guilty or would have been found incompetent to do so. Thus, Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief. Accordingly, we conclude that the common pleas court properly denied [these] claims.

*Id*. We must consider whether this was an "unreasonable application" of *Strickland* based solely on the record before the state court. *Pinholster*, 131 S. Ct. at 1398. That is, despite the elucidation of the testimony of Dr. Cooper, Dr. Dunsieth, and Dr. Tureen before the district court, we must ignore that evidence in evaluating the reasonableness of the state court's decision. *See Hanna*, 694 F.3d at 606.

Of the additional evidence that Petitioner submitted to the state post-conviction court, the only illuminating piece of evidence is the jail records. The jail records advance Petitioner's claim of ineffective assistance at trial in two ways: (1) they confirm that although trial counsel stated at trial that Petitioner was only on one medication: Risperdal, he was actually on four: Trazodone, Benadryl, Ativan, and Seroquel; and (2) they provide further details about Petitioner's mental impairments. That fuller picture, however, is not necessarily helpful to Petitioner because the records have Dr. Dunseith describing Petitioner as having "coherent cognition" and as being "fully oriented [with a] memory intact [and] avg [sic] intelligence." (Resp't App. at p. 1431.) They go on to document Dr. Dunsieth's diagnosis of malingering psychosis due to the "significantly exaggerated symptoms" that Petitioner displayed. (*Id*. at 1431–32.)

The crux of Petitioner's claim is that had counsel adequately performed by informing themselves and the trial court of Petitioner's mental impairments, that court would not have accepted Petitioner's jury waiver and plea as knowing, intelligent, and voluntary. However, on the record that the state post-conviction court had before it, we

cannot say that the Ohio Court of Appeals unreasonably applied *Strickland* in denying Petitioner's claims.

### 1.        Performance

Looking first to the performance prong of *Strickland*, Petitioner's trial counsel were clearly aware of Petitioner's mental issues. Before trial, counsel had Petitioner examined by two mental health professionals, Dr. Cooper and Dr. Tureen. Moreover, Petitioner's erratic behavior of interrupting the trial and demanding to plead guilty (and then having to be excused from the courtroom) would further alert counsel that something might have been amiss. Wenke indicated as much when he initially requested that Petitioner be evaluated for his competency to enter a plea. Upon questioning by the trial court, however, Wenke admitted that he did not believe Petitioner to be unable to appreciate the consequences of his plea and waivers. *Cf. Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (The "capacity to understand the warnings given him, the nature of his . . . rights, and the consequences of waiving those rights" is a factor in a court's determination of whether a plea is knowing and voluntary.). Both Wenke and the prosecutor repeatedly reaffirmed their belief that Petitioner was competent. In the face of Petitioner's adamant and seemingly informed desire to plead guilty and forego a trial, it is unclear, based on the record that the state court reviewed, what more counsel should have done as none of the experts who evaluated Petitioner ever expressed doubts about Petitioner's competency or his ability to waive his rights. *See Fautenberry v. Mitchell*, 515 F.3d 614, 625–26 (6th Cir. 2008) (concluding that "it was objectively reasonable for counsel to rely upon the doctor's opinions and conclusions"); *accord Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (holding, in a case where there was "no evidence that [the expert] was incompetent[ ] or that [the petitioner's] lawyers had any reason to question [the expert's] professional qualifications," that "it was objectively reasonable for . . . trial counsel to rely upon [the expert's] diagnosis").

### 2. Prejudice

Even assuming deficient performance, Petitioner has not shown any prejudice with respect to his claim of ineffective assistance at trial. Because the essence of his claim is that if he had effective trial counsel, there is a reasonable probability his plea would have been different (i.e., not accepted), Petitioner needs to demonstrate that the trial court would have probably found Petitioner unable to waive his rights. First, such a probability seems remote when one considers that no expert ever opined to that effect. Second, the three-judge panel engaged in a lengthy plea colloquy where Petitioner responded lucidly and appropriately to all questions, including ones about his mental state and medications. Third, the only potentially helpful evidence that Petitioner submitted during state post-conviction proceedings to support his ineffective assistance at trial claim was his jail records, but as discussed above, these records reflect an additional diagnosis of malingering psychosis that would likely have been detrimental to any claim of Petitioner's inability to waive his rights. On the record before the Ohio Court of Appeals, we cannot say that Petitioner has shown that there is a reasonable probability that but for counsel's alleged errors the trial court would have refused to accept Petitioner's plea and waiver, *see Hill*, 474 U.S. at 59, let alone that no fairminded jurist could have come to the result reached by the Ohio Court of Appeals. *See Richter*, 131 S. Ct. at 786. Therefore, we cannot grant Petitioner relief on his ineffective assistance at trial claim.

### B. Sentencing

Similar to his ineffectiveness-at-trial claim, Petitioner contends that his trial counsel were ineffective by failing to investigate and present to the three-judge panel evidence about his mental impairments so as to mitigate his death sentence. On this claim, the Ohio Court of Appeals concluded,

> Fitzpatrick failed to submit in support of [this] claim evidence that he had, as the mitigation specialist [(Crates)] had suspected, acted under something other than a voluntary "[s]ubstance-induced psychotic disorder." Thus, he failed to demonstrate a reasonable probability that, but for his counsel's failure to employ a mitigation specialist, the [Ohio

> Rev. Code §] 2929.04(B)(3) mitigating factor would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors. Because Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief, we conclude that the common pleas court properly denied this aspect of [this] claim.

*Fitzpatrick*, 2004 WL 2367987, at *11 (footnote omitted). Unlike with the ineffective assistance during the guilt-phase claim, the Ohio Court of Appeals appears only to have decided this claim on the basis that Petitioner was not prejudiced by any error (assuming one existed). Because the state court did not consider the performance prong of *Strickland*, that prong will be analyzed *de novo*, *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012), taking into account the evidence developed in the district court. *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) ("[I]f [a] claim was never adjudicated on the merits in state court, the claim does not fall under 28 U.S.C. § 2254(d) and *Pinholster* does not apply." (internal quotation marks omitted)). However, because the state court adjudicated the prejudice prong, that prong will be reviewed under AEDPA, *Rayner*, 685 F.3d at 639, based solely on the record before the Ohio Court of Appeals, *Hanna*, 694 F.3d at 606.

### 1.          Performance

It is clearly established that an attorney's failure to reasonably investigate the defendant's background and present mitigating evidence at sentencing can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003). While counsel is entitled to rely on the opinions of an expert, *Fautenberry*, 515 F.3d at 625–26, to be entitled to such reliance counsel cannot willfully blind himself to the expertise of such an expert—which is exactly what happened here. In this case, Petitioner's counsel retained Dr. Tureen to determine if Petitioner was "psychotic and not guilty by reason of insanity." (R. 45-4, Tureen Aff., at PID# 776.) In the course of his evaluation of Petitioner, Dr. Tureen conducted an IQ test on Petitioner, on which Petitioner scored a 69 (borderline mild mental retardation). Despite Dr. Tureen's offer to provide Petitioner's trial counsel with the results of the IQ test, which would clearly have been mitigating, *see Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (stating

"impaired intellectual functioning is inherently mitigating" (citing *Atkins v. Virginia*, 536 U.S. 304, 316 (2002))), Petitioner's trial counsel refused to receive the IQ test results. Such a decision cannot be considered a "reasonable investigation into Petitioner's mental state." *See Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006). Therefore, upon *de novo* review, we find Petitioner's trial counsel's performance to be unreasonable, even given the wide latitude afforded by *Strickland*. *See Richter*, 131 S. Ct. at 787.

### 2.          Prejudice

Whereas the performance prong can be evaluated *de novo*, the Ohio Court of Appeals' decision with respect to prejudice must be given AEDPA deference, *Rayner*, 685 F.3d at 639, and this Court cannot consider the evidence that Petitioner developed in the district court, *Pinholster*, 131 S. Ct. at 1398; *Hanna*, 694 F.3d at 606. On the record that the state post-conviction court had, i.e., not considering the later testimony of Dr. Cooper and Dr. Dunsieth or Dr. Tureen's affidavit, there was no prejudice under *Strickland*. The evidence before the state court, as discussed above, confirmed the representations made by Petitioner's trial counsel that Petitioner was able to knowingly and voluntarily enter into a plea and waive his rights. The Ohio Court of Appeals had before it the representations of three attorneys, written waivers, lengthy colloquies by the trial court about Petitioner's mental state, as well as jail records that discuss Petitioner as displaying malingering psychosis. It was not unreasonable, on that record, for the state court to conclude that further investigation into Petitioner's mental state would not lead to information that would have caused the three-judge panel not to impose the death penalty.

Even though our *de novo* review revealed deficient performance, we cannot grant Petitioner relief on his ineffective assistance of counsel at sentencing claim, inasmuch as *Pinholster* requires us to ignore the evidence of prejudice provided by the testimony of Dr. Cooper and Dr. Dunsieth, as well as Dr. Tureen's affidavit—because that evidence was not provided to the state court or made a part of the state court record.

## II.      Jury Waiver and Guilty Plea

In his second issue, Petitioner argues that his jury waiver and guilty plea were not entered into knowingly, intelligently, and voluntarily.[4] This claim was presented to the Ohio Supreme Court on direct appeal, and that court found,

> Nothing in the record suggests that Fitzpatrick's jury waiver was involuntary. When the trial court accepted Fitzpatrick's written waiver, Fitzpatrick affirmed that his decision was voluntary. He also affirmed that his counsel had reviewed the waiver form with him and that he had discussed his decision with them. A defendant's having had the advice of counsel is a factor supporting a finding of voluntariness. [*State v.*] *Bays*, 716 N.E.2d 1126 [(Ohio 1999)].
>
> Although Fitzpatrick was on medication when he executed the waiver, he denied that the medication interfered with his ability to understand the waiver form or the proceedings. Nothing in the record contradicts this. . . .
>
> Importantly, Fitzpatrick's decision to waive a jury trial followed from his decision to plead guilty. . . . It is clear from the record that his decision to plead guilty was voluntary: Fitzpatrick initiated that decision, insisted upon it against advice of counsel, and held to it through a lengthy plea colloquy.
>
> . . .
>
> In this case, the record contains a representation by defense counsel that they had explained the charged offenses to Fitzpatrick. At the end of Fitzpatrick's written guilty plea is the following statement, which was

---

[4]Petitioner specifically notes that his "appeal is not [about] competency." (Reply Br. at 2.) The Supreme Court has explained the difference between competency and knowing-and-voluntary claims:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.

*Godinez v. Moran*, 509 U.S. 389, 400–01 & n.12 (1993) (citations omitted).

Petitioner's specificity on this point is understandable since the Ohio Court of Appeals found his competency claim barred by Ohio's res judicata rule because he had not raised it on direct appeal when he could have. *Fitzpatrick*, 2004 WL 2367987, at *8; *see also Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004) (citing *State v. Perry*, 226 N.E.2d 104, 105–06 (1967)) (Ohio's res judicata rule "provides in relevant part that a final judgment of conviction bars a convicted defendant from raising in any proceeding, except an appeal from that judgment, any issue that was raised, or could have been raised, at trial or on appeal from that judgment."). Therefore, had his federal habeas claim been based on competency, it would have been procedurally defaulted. *See Williams*, 380 F.3d at 967; *see also Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991); *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc).

signed by his counsel: "We have explained to the Defendant, STANLEY L. FITZPATRICK, prior to his signing this plea, the charge(s) in the indictment, the penalties therefore [sic] and his constitutional rights in this case."

Moreover, both the written plea and the plea colloquy contained representations by Fitzpatrick that he had spoken with his counsel and understood the charges against him. Fitzpatrick asserted that he had graduated from high school and could read without any problem. He also agreed that he had talked to his attorneys about the case for "many, many hours." The written plea states: "I understand the nature of the charges against me in the Indictment and the possible defenses I might have," and "I understand the nature of the charges to which I plead guilty." During the colloquy, the presiding judge asked: "[D]o you understand the charges against you?" Fitzpatrick said, "Yes." The judge asked: "Do you want all or any part of any of the charges against you explained in any way?" Fitzpatrick said, "No."

*Fitzpatrick*, 810 N.E.2d at 934, 937. On the record before it, the Ohio Supreme Court held that Petitioner's jury waiver and guilty plea were knowing and voluntary. *Id.* at 936, 938.

AEDPA deference applies to our review of the Ohio Supreme Court's decision about the validity of Petitioner's jury waiver and guilty plea. Both jury waivers and guilty pleas must be entered knowingly, voluntarily, and intelligently in order to be constitutionally effective. *Brady v. United States*, 397 U.S. 742, 748 (1970) (citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) (additional citations omitted). Such a determination is made after "considering all of the relevant circumstances surrounding" the plea or waiver. *Brady*, 397 U.S. at 749; *Adams*, 317 U.S. at 275. As to jury waivers, the defendant must understand that the choice he faces is to be judged by a jury composed of people from the community as opposed to having his guilt or innocence determined by a judge. *Haliym v. Mitchell*, 492 F.3d 680, 698 (6th Cir. Cir. 2007); *see also Adams*, 317 U.S. at 278; *Patton v. United States*, 281 U.S. 276, 311–12 (1930), *abrogated on other grounds by Williams v. Florida*, 399 U.S. 78 (1970). For a guilty plea to be valid, the defendant is required to understand the nature of the charges against him and the consequences of pleading guilty, including the possible punishments and loss of other rights. *See Brady*,

397 U.S. at 749 ("[R]elevant circumstances surrounding" a plea include the "possibility of a heavier sentence following a guilty verdict at trial," such as the death penalty.); *Boykin v. Alabama*, 395 U.S. 238, 243 (1969) ("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial."); *see also Bradshaw v. Stumpf*, 545 U.S. 175, 182–83 (2005).

Reviewing the record that the Ohio Supreme Court had before it, there is no basis to upset the Ohio Supreme Court's conclusion that Petitioner's jury waiver and guilty plea were entered knowingly, voluntarily, and intelligently. Before accepting Petitioner's jury waiver, the trial court reviewed the written waiver form with Petitioner, asked whether Petitioner had any questions about the form, ensured that Petitioner signed the form voluntarily, and confirmed that Petitioner's trial counsel had discussed the form and its consequences with Petitioner. Wenke then discussed the medication that Petitioner was taking and represented to the court that he did not believe that the medication affected Petitioner's decision to waive his jury rights. Further, Petitioner confirmed that the medication did not affect his ability to understand his jury waiver.

The eleven-page written plea form that Petitioner signed discussed Petitioner's charges and the maximum penalties associated with those charges (including the death penalty), detailed the three-judge panel procedure under which the remainder of his trial and sentencing would proceed, outlined the rights Petitioner was waiving by pleading guilty, and contained an acknowledgment that Petitioner was pleading guilty "knowingly, intelligently, and voluntarily" with counsel present. (Resp't App. at pp. 1345–53.) The penultimate page of the plea form, which was a statement signed by Petitioner's trial counsel, Cutcher and Wenke, and the state prosecutor, states that they informed Petitioner of the rights he was waiving and that in their opinion, Petitioner "is competent to enter this plea and now does so knowingly, intelligently and voluntarily." (*Id.* at 1354.) In front of the three-judge panel, Petitioner engaged in a discussion of the charges against him and the consequences of pleading guilty. The three-judge panel reviewed the written plea form with Petitioner, who affirmed that it was his desire to plead guilty and that he understood what he was doing. The three-judge panel also

probed Petitioner about his medication and its effect on him. Throughout the proceedings, Petitioner's responses to questions were appropriate, even telling the court that his medication controlled his hallucinations.

None of Petitioner's written or oral statements gave the trial court reason to believe that he did not understand the consequences of waiving a jury trial and pleading guilty. Additionally, all three attorneys involved, Cutcher, Wenke, and the prosecutor, consistently represented to the court that they thought that Petitioner was knowingly waiving his rights. On this record, we cannot say that the Ohio Supreme Court erred in finding that Petitioner's jury waiver and guilty plea were entered knowingly, intelligently and voluntarily. Therefore, we cannot grant Petitioner habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Petitioner's petition for a writ of habeas corpus.