RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

MARK HARTMAN,

       *Petitioner-Appellee/Cross-Appellant*,

    *v.*

DAVE YOST, Ohio Attorney General,

       *Respondent-Appellant/Cross-Appellee*.

Nos. 23-3309/3365

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:19-cv-00003—Walter H. Rice, District Judge.

Argued: May 2, 2024

Decided and Filed: July 24, 2025

Before: GIBBONS, McKEAGUE, and STRANCH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Stephanie L. Watson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Dave Yost. S. Adele Shank, LAW OFFICE OF S. ADELE SHANK, Columbus, Ohio, for Mark Hartman. **ON BRIEF:** Stephanie L. Watson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Dave Yost. S. Adele Shank, LAW OFFICE OF S. ADELE SHANK, Columbus, Ohio, for Mark Hartman.

─────────────

## OPINION

─────────────

McKEAGUE, Circuit Judge. A grand jury in Montgomery County, Ohio, indicted Mark Hartman for three counts of rape that occurred during a late-night sexual encounter. After a bench trial, a state judge convicted him of all three counts. Hartman now petitions for habeas

relief under 28 U.S.C. § 2254, alleging that his two trial counsel provided constitutionally ineffective assistance by improperly cross-examining witnesses during the trial. He also alleges his counsel provided ineffective assistance by misstating material facts about bench and jury trials and inducing him to waive his right to a jury. Ohio courts rejected his claims on the merits. Hartman argues that the state courts unreasonably applied *Strickland v. Washington* when they did so.

Those state-court decisions were not unreasonable. The district court erred by granting Hartman relief on his cross-examination claim. But the court properly denied relief on Hartman's jury-waiver claim. We **REVERSE** the district court's grant of a habeas writ on Hartman's cross-examination claim, **AFFIRM** the district court's denial of relief on his jury-waiver claim, and **REMAND** with instructions to deny Hartman's petition for a writ of habeas corpus.[1]

## I.

Late in the evening of December 30, 2013, Mark Hartman—home from college for winter break—and some of his friends hosted a small party. *State v. Hartman*, 64 N.E.3d 519, 527 (Ohio Ct. App. 2016). One of Hartman's friends invited a woman with the initials M.W. to

---

[1]After oral argument, Hartman filed (1) a motion for relief from judgment under Fed. R. Civ. P. 60(b) in the district court, and (2) a motion asking this Court to remand the case after the district court indicated how it would rule on his Rule 60(b) motion. *See* Fed. R. Civ. P. 62.1(a); Fed. R. App. P. 12.1(b). Both motions argued that a then-recent Supreme Court decision, *Smith v. Arizona*, 602 U.S. 779 (2024), applied to two of his original claims for habeas relief that were not before this Court on appeal. Hartman's Rule 60(b) motion was pending before the district court for more than eight months. Without reaching the merits of the motion, the district court ultimately concluded that it was a "second or successive" habeas petition because it relied on "a subsequent change in substantive law" to justify relief. *Gonzalez v. Crosby*, 545 U.S. 524, 530–32 (2005); 28 U.S.C. § 2244(b)(2). Because the motion constituted a second or successive habeas petition, the district court transferred it to this Court for authorization. *See* 28 U.S.C. § 2244(b)(3); *In re Hartman*, No. 25-3453 (6th Cir. 2025). This Court informed Hartman that he must apply for authorization to file a second or successive habeas petition by July 23, 2025. *See* 6 Cir. R. 22(b). This opinion does not decide whether Hartman's Rule 60(b) motion is a second or successive habeas petition, nor does it address whether he is authorized to file second or successive habeas petition; the Court will consider those questions in due course.

the house.  Early the next morning, Hartman raped M.W. three times by force or threat of force.  *See* Ohio Rev. Code § 2907.02(A)(2).[2]

## A.    Criminal Trial and Conviction in State Court

In July 2014, a grand jury indicted Hartman.  After his case was assigned to a judge, Hartman waived his right to a jury trial.  Hartman argues that he did so because of several statements counsel made to him during a pretrial meeting.  Those statements included that (1) the trial judge was one of a small number of judges before whom counsel would suggest choosing a bench trial; (2) trial counsel had a good relationship with the judge; (3) the judge had "all sons and would understand from a male's point of view" (the judge actually had only daughters); and (4) media coverage at the time would make it hard to get "all twelve jurors to side with" Hartman.  State Ct. Docs., R.5-2 at PageID 641.  Hartman says that trial counsel never told him that a judge "could overturn a jury's verdict," that a bench trial was "very hard to reverse," that "just one juror" who disagreed with a guilty verdict could "save" him, or that "evidentiary questions would be severely limited if not eliminated" on direct appeal.  *Id.* at PageID 569, 641.

The bench trial began on September 29, 2014.  The evidence at trial revealed the following events.  On a late-December evening, Hartman went to a friend's house.  Hartman and two friends began drinking.  Hartman also smoked some marijuana. Later, one friend invited a group of three women to join the party.  The group included M.W.  The party continued into the early morning hours.  Hartman drank enough alcohol that he vomited; one of the women began to feel sick, so M.W. and the third female friend took her home.  M.W. and the friend then rejoined the group.  At that point, M.W. began drinking, although she testified that she never became intoxicated.  Testimony conflicted as to the amount she drank.

During M.W.'s direct examination, she testified that the group ordered food and began playing a card game.  Eventually, everyone but Hartman and M.W. left the room where they had all been sitting. Hartman and M.W. sat and talked, and then M.W. decided to go to bed.  Hartman offered to show her to her room.  Hartman then kissed M.W.  She testified that she

---

[2]The provision makes it a first-degree felony to "engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."  Ohio Rev. Code § 2907.02(A)(2).  Victims "need not prove physical resistance to the offender."  *Id.* § 2907.02(C).

consented to the kiss, but he then "tried to go up" her shirt. Trial Tr., R.7-1 at PageID 1217. She told him not to, and he stopped. He "pushed" her "onto the bed," then went up her shirt again. *Id.* Again, she said no. They kissed again. But then Hartman continued to touch her. And she testified that she "kept saying no" and "didn't want" him to put his hands down her pants. *Id.* at PageID 1218. She described how Hartman took off her shirt, bra, and leggings. And she said Hartman roughly kissed her neck, bruising her; grabbed her chest; and penetrated her vagina with his finger. In his testimony, Hartman disputed many of these details, claiming that she explicitly agreed to have sex with him.

M.W. further testified that, with her clothes off and Hartman roughly touching her, she became scared. She knew she wasn't "as strong as he was," and she grew worried that she didn't know where any of her other friends were. *Id.* at PageID 1220–21. She feared that she would not be able to get out and that Hartman might hit her. So while Hartman was penetrating her with his finger, she just "sat there." *Id.* at PageID 1223. She resolved "a few times" to "go along with it" in the hopes that he might let her go or she could "escape." *Id.* She reiterated to him that she didn't want to continue, but he then began having sex with her. She says he told her not to worry—that it would be "fun" and "fine" and she "shouldn't be too worried about it." *Id.* at PageID 1224. She continued to say "no." *Id.* Hartman took a "brief" break lasting "a minute or two," but then he started to have sex with her again. *Id.* at PageID 1225.

Still on direct examination, M.W. testified that she got up to go to the bathroom, hoping that she could "get away from the situation." *Id.* at PageID 1225–26. Hartman followed her. He got into the shower, then "grabbed" her arm and "pulled" her in with him. *Id.* at PageID 1226–27. She began to cry while in the shower with him. *Id.* at PageID 1228. While in the shower, Hartman again groped and kissed M.W. She told him she didn't "want this" and got out of the shower. *Id.* Hartman followed her to the bedroom, "pushe[d]" her "back onto the bed," and had sex with her again. *Id.* at PageID 1228–29. When Hartman was finished, M.W. attempted to leave, but he pulled her back into the bed where she stayed until one of her friends found her. M.W. left visibly upset. M.W.'s friend took her home. After M.W.'s parents saw marks on her neck, she told them about the assault. The family went to the hospital, where M.W. spoke to an emergency-room doctor, a detective, and a sexual-assault nurse-examiner.

During M.W.'s cross-examination, Hartman's counsel asked her questions about the force that Hartman had used during the assault. For instance, counsel confirmed that Hartman had pushed her on the bed when they first entered the bedroom. Counsel then asked M.W. to "demonstrate" how he had done so. *Id.* at PageID 1261. Counsel also asked about Hartman's efforts to pull off M.W.'s clothing, wondering whether Hartman was "restraining" M.W. in some way. Counsel followed up by asking, "But when he was on top, you managed to get up in an effort to try and get away?" *Id.* at PageID 1263. Counsel then asked about the statement M.W. had submitted to the detective, clarifying that M.W. had "indicated" that Hartman had "pinned down" her arms. *Id.* Counsel further asked about a statement M.W. made to the nurse-examiner that Hartman had "held" her down by her "wrists." *Id.* at PageID 1268. Counsel followed up by remarking that M.W. had testified he held her down by her "arms," but that she was "pointing to [her] shoulders." *Id.* at PageID 1269. Counsel also confirmed that M.W. claimed she was "kicking" and resisting Hartman's efforts to pull off her clothes, but that she wasn't "yelling," even though she had earlier told the nurse-examiner that she *had* been yelling while the assault occurred. *Id.* at PageID 1270–71.

Testimony from two other witnesses is also relevant to this appeal. The state called one of M.W.'s friends—the one who took her home the morning after the assaults—and the police detective who took M.W.'s report.

On direct examination, M.W.'s friend testified that it was "unexpected" that M.W. and Hartman were "going to bed together," because there were no indications the two had been flirting with each other. *Id.* at PageID 1299–1300. She said she was confused because that wasn't M.W.'s "typical behavior." *Id.* at PageID 1305. On cross-examination, Hartman's counsel confirmed with the friend that it was a "surprise because it's out of character" for M.W. *Id.* at PageID 1328. Counsel then questioned M.W.'s friend on whether M.W. had at all hinted that she was uncomfortable with Hartman's advances. The friend said no. Counsel further asked whether the friend was confused because M.W. was acting "out of character." *Id.* at PageID 1337. The friend agreed. Counsel then responded, "Except that you had believed that [M.W.] was going to hook up with [Hartman] the night before[,] right?" *Id.* at PageID 1338. To that, M.W.'s friend responded, "I never believed that." *Id.* Counsel then asked about the friend's

knowledge of M.W.'s prior sexual activity—a line of questioning that the trial judge ended because of Ohio's rape shield rule.[3]

When the detective took the stand, the state asked him to recount his observations of M.W. while she made her report. The detective described her as tearful and struggling to regain her composure. He described injuries to both sides of M.W.'s neck, her breast, and her back. The detective further testified about the statement he had taken from Hartman. On cross-examination, Hartman's counsel sought to rebut the detective's implication that Hartman had lied to him in the statement. And trial counsel also explored what he contended were a "number of inconsistencies" in M.W.'s statement. *Id.* at PageID 1480. For instance, he asked about M.W.'s claim that she had been yelling, the amount of wine M.W. had consumed, and whether any of the marks on M.W.'s body resulted from the sexual assault that had occurred while Hartman grabbed M.W. and pulled her into the shower. Counsel also tried to elicit an acknowledgment that M.W. had described the level of force used during the assault in several different ways.

The judge returned a guilty verdict on all counts. The judge specifically found that Hartman lacked credibility. He then sentenced Hartman to four concurrent years on each count. After his release, Hartman's conviction subjected him to five years of "post-release control," a period of supervision by a parole board. Hartman also has an ongoing duty to register in a state sex-offender database for the rest of his life. *See* Ohio Rev. Code §§ 2950.04, 2950.13.

**B.     Direct Appeal in State Court**

Hartman timely appealed the judgment. He raised a claim that his trial counsel improperly cross-examined several trial witnesses ("cross-examination claim"). Hartman argued that his trial counsel were ineffective because they introduced evidence of force during M.W.'s cross-examination that the state had failed to prove. He also argued that counsel "bolstered" the state's case against Hartman with inadmissible hearsay and character evidence from cross-examinations of M.W.'s friend and the police detective.

---

[3]Ohio's rape shield rule prohibits admission of "opinion evidence of the victim's sexual activity" unless it involves "evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, or the victim's past sexual activity with the offender." Ohio Rev. Code § 2907.02(D).

The Ohio Court of Appeals rejected this claim. The court "agree[d] with Hartman's assertion that defense counsel, on cross-examination of the victim, brought up factual matters not presented during the direct examination of the victim" that may have helped the state's case. *Hartman*, 64 N.E.3d at 542. But the court noted that it was "at least arguable" that the state had sufficiently proven force for, at a minimum, the final rape count. *Id.* The court found that trial counsel could reasonably have concluded that Hartman's best strategy was to "attack" M.W.'s "credibility" about "facts relevant to the issue of force" on cross-examination. *Id.* The court also found that the evidence elicited from M.W.'s friend was admissible under Ohio law because it helped the trial judge assess her veracity. *Id.* at 542–43. And the court concluded that Hartman was not prejudiced by counsel's failure to object to the detective's hearsay testimony. *Id.* at 543. The court said it was reasonable "to allow the admission of the victim's various statements of the incident" in order to point out inconsistencies between M.W.'s pre-trial statements and her testimony during trial. *Id.* at 544.

Hartman then sought review in the Ohio Supreme Court. The court declined to accept his appeal. *State v. Hartman*, 60 N.E.3d 7 (Ohio 2016) (table). The Ohio appellate court's opinion on direct appeal is the last reasoned state court decision on Hartman's cross-examination claim.

## C.     State Post-Conviction Proceedings

Hartman also petitioned for post-conviction relief in state trial court. Relevant here, he claimed that he was denied effective assistance of counsel when his attorney made misleading statements about bench trials and failed to obtain his informed consent to the waiver of a jury trial ("jury-waiver claim").

The trial judge granted the state's motion for summary judgment. The court of appeals affirmed. *State v. Hartman*, 2017-Ohio-7933 (Ohio Ct. App. 2017). The appellate court agreed that defense counsel's advice "to a client to waive his right to a jury trial has been considered sound trial strategy in the absence of" other record evidence. *Id.* at ¶ 77 (quoting *State v. Neitzel*, No. 98 CA 11, 1998 WL 735942, at *6 (Ohio Ct. App. Oct. 23, 1998)). And it emphasized that, without "supporting evidence, the mere claim that a jury would have believed" Hartman falls "far short of establishing a reasonable probability" of a different outcome. *Id.* (quoting *State v.*

*Aaron*, No. 00AP-268, 2000 WL 1753151, at \*4 (Ohio Ct. App. Nov. 30, 2000)). Because Hartman had failed to establish that he was prejudiced, the court determined that counsel had not been ineffective in advising him to opt for a bench trial. *Id.* at ¶ 78.

Hartman again sought review by the Ohio Supreme Court, which again declined to hear his appeal. *State v. Hartman*, 93 N.E.3d 1005 (Ohio 2018) (table). The Ohio appellate court's post-conviction opinion is the last reasoned state decision on Hartman's jury-waiver claim.

**D.  Federal Habeas Proceedings**

Hartman petitioned a federal district court for habeas relief. He raised his cross-examination claim and his jury-waiver claim. The district court granted relief on the cross-examination claim. The court reasoned that trial counsel had introduced evidence of force that hadn't been proven during direct examination. Counsel's failure to object to statements from M.W.'s friend and the detective had a similar prejudicial effect. Because the trial was "fundamentally unfair" in the court's view, Hartman had succeeded under *Strickland*'s ineffective-assistance standard. Order, R.45 at PageID 2613–14.

The district court denied Hartman's jury-waiver claim. It held that the strategy to advise a bench trial was sound. It also found that the Ohio appellate court's holding that Hartman had failed to show prejudice was reasonable. But the court further concluded that reasonable jurists could disagree with its finding and certified the claim for appeal.

The state—at the time, the Ohio Adult Parole Authority—timely appealed the district court's writ on Hartman's cross-examination claim. Hartman timely cross-appealed the district court's denial of his jury-waiver claim. Hartman moved this Court to expand the certificate of appealability. Motion, D.8 at 1–12. In a single-judge order, the Court denied the motion. *Hartman v. Ohio Adult Parole Auth.*, Nos. 23-3309/3365 (6th Cir. Sept. 15, 2023).

**II.**

Before moving to the merits of these cross-appeals, we briefly address an earlier justiciability argument. In May 2023, Hartman moved this Court to dismiss the state's appeal. He argued that because he had completed a full term of post-release control, the Parole Authority

no longer had custody over him and could not comply with a habeas writ.  In response, the Parole Authority proposed substituting the Ohio attorney general. Hartman agreed. He then moved to substitute the attorney general.  This Court granted the motion.  *Id.*

Hartman's completion of post-release control does not moot his appeal.  For the case to continue, there must be an "actual injury traceable to" the attorney general that would likely "be redressed by a favorable judicial decision."  *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  Because Hartman has been released from custody, he must face some "collateral consequence" of his conviction that causes him a "concrete and continuing" injury.  *Id.*  We must make a similar finding for the attorney general.

Hartman's lifetime registration requirement is a collateral consequence that prevents his appeal from becoming moot.  *See United States v. Juv. Male*, 560 U.S. 558, 560–61 (2011) (describing a continuing sex-offender registration requirement as a "likely potential 'collateral consequence'" of a state conviction); *Kittka v. Franks*, 539 F. App'x 668, 670–71 (6th Cir. 2013) (holding that sex-offender registration and notification requirements constituted collateral consequences of the petitioner's state sentence).  A favorable decision for Hartman on either claim would require the state to vacate Hartman's conviction and retry him.  The attorney general would need to absolve Hartman—at least until a new conviction and sentence—of his reporting obligations.  That keeps Hartman's appeal alive.

Similarly, if the attorney general obtains a reversal of the habeas writ, he will not be required to vacate Hartman's conviction and retry him.  The attorney general seeks redress for the interest he has in preserving Hartman's conviction and sentence from vacatur.  A decision in his favor would release him and the State of Ohio from the "burden" of a "new trial," so his appeal is also not moot.  *Calderon v. Moore*, 518 U.S. 149, 150 (1996).

**III.**

There are two appeals here.  First, the attorney general argues that the district court erred by granting Hartman relief on his cross-examination claim.  Second, Hartman argues the court erred by denying his jury-waiver claim.  We review de novo both the grant and denial of habeas relief.  *See Hodge v. Jordan*, 95 F.4th 393, 398 (6th Cir. 2024); *Upshaw v. Stephenson*, 97 F.4th

365, 370 (6th Cir. 2024).  We review a district court's fact findings for clear error.  *Upshaw*, 97 F.4th at 370.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), state courts' findings of fact and law are entitled to deference.  We presume factual findings are correct unless "clear and convincing evidence" rebuts the presumption."  *Id.* (quoting *Ferensic v. Birkett*, 501 F.3d 469, 473 (6th Cir. 2007)).  For claims adjudicated on the merits in state court, federal courts may not grant relief unless the state decisions were "contrary to" or "involved an unreasonable application" of "clearly established" Supreme Court decisions.  *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  So under § 2254(d)(1), we may grant relief only where (1) the state court arrived at an opposite conclusion as the Supreme Court or decided a case differently on "materially indistinguishable facts" or (2), relevant here, where the state court identified "the correct governing legal principle" from Supreme Court caselaw but "unreasonably" applied the principle to the petitioner's case.  *Williams*, 529 U.S. at 413.

Where a petitioner raises ineffective-assistance-of-counsel claims that a state court has already rejected, our review is "doubly" deferential to counsel's strategic choices during the trial. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  Hartman must satisfy *Strickland v. Washington*'s two-pronged test to show that he did not receive the legal assistance the Constitution guarantees him.  466 U.S. 668 (1984).  But he must also overcome AEDPA's robust deference to the state courts' application of *Strickland*.

*Ineffective-assistance claims.*  The first inquiry under *Strickland* requires that Hartman show that his counsels' performance was deficient, meaning they made such serious errors that they were not "functioning" as the "counsel" guaranteed by the Sixth Amendment.  *Id.* at 687. Our scrutiny is "highly deferential," given the benefit of hindsight.  *Id.* at 689.  Indeed, we afford trial counsel a "strong presumption" that their conduct "falls within the wide range of reasonable professional assistance" and "sound trial strategy."  *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  We may "affirmatively consider the range of possible reasons behind counsel's decisions," even if counsel did not invoke those reasons at trial.  *Woodburn v. Morrison*, No. 22-2084, 2024 WL 51317, at *4 (6th Cir. Jan. 4, 2024); *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

Next, Hartman must show that counsel's constitutionally deficient performance prejudiced Hartman's defense during the trial. *Strickland*, 466 U.S. at 691–92. The prejudice must be so severe as to deprive the defendant of a fair trial with a reliable result. *Id.* at 687. Without the actual or constructive denial of counsel, the state's interference with counsel's performance, or some kind of actual conflict of interest, we do not presume that any deficiencies in counsel's performance resulted in prejudice. *See id.* at 692. Hartman must affirmatively show that he was prejudiced. *See id.* at 693. In sum, he must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding" would be different. *Id.* at 694.

*Habeas review of ineffective-assistance claims.* AEDPA magnifies Hartman's burden. Hartman can prevail only if the state court's application of clearly established federal law was "objectively unreasonable." *Williams*, 529 U.S. at 409. That's a higher burden than showing the state-court decision was merely "incorrect." *Id.* at 410. An incorrect decision still stands under federal habeas review unless it was *also* objectively unreasonable. *See Hodge v. Plappert*, 136 F.4th 648, 661 (6th Cir. 2025) (en banc). So the decision stands as long as "fairminded jurists could disagree" about its "correctness." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A state court's rejection of a claim *precludes* federal habeas relief unless no fairminded jurist could agree with the state court. *Id.* It's not enough that the petitioner might succeed in federal court on a de novo application of Supreme Court caselaw. "AEDPA demands more." *Id.* at 102.

When the last state court to review the case issued a summary ruling without reasoning, our review of state-court decisions "look[s] through" the unreasoned state-court orders to the last reasoned state-court opinions addressing the claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991). Here, we look through the Ohio Supreme Court's denials of Hartman's petitions to the Ohio appellate court decisions.

To succeed on his claims, then, Hartman must clear AEDPA's doubly deferential standard: he must show the *Ohio courts'* application of *Strickland* was objectively unreasonable. *Harrington*, 562 U.S. at 105; *Hodge*, 136 F.4th at 661. The range of reasonable conduct under *Strickland* is "substantial." *Harrington*, 562 U.S. at 105. The additional burden to show that

there is no reasonable argument that the state court unreasonably applied "*Strickland*'s deferential standard" leaves Hartman little room for success. *Id.* In short, he must show that "*every* fairminded jurist would agree that *every* reasonable lawyer" would have pursued a different strategy. *Dunn v. Reeves*, 594 U.S. 731, 740 (2021) (cleaned up).

We need not look far to find reasonable strategies that might justify counsel's actions in Hartman's case. Indeed, the Ohio courts identified several—and in the context of this case, those strategies were not unreasonable. As a result, Hartman cannot succeed on his habeas claims.

## A.     Ineffective Assistance of Counsel in Cross-Examination

The attorney general's appeal concerns Hartman's claim that his counsel rendered ineffective assistance through deficient cross-examination of the victim and two other witnesses during trial.[4] Hartman's brief focuses in large part on trial counsel's cross-examination of M.W., although he suggests briefly that trial counsel improperly cross-examined M.W.'s friend and the police detective as well. The attorney general argues that counsel's cross-examination tactics aimed to uncover inconsistencies in M.W.'s testimony, tending to discredit the truthfulness of her account. The district court found that Hartman's counsel was constitutionally ineffective and

---

[4]Hartman also argues that the state courts made unreasonable fact determinations about the use of "force" and merely "substitute[d]" the victim's "own explanation of what caused her fear." Second Br. at 35–36; *see* 28 U.S.C. § 2254(d)(2). But this argument is indistinguishable from the first claim in the habeas petition he filed, which alleged the state had failed to introduce sufficient evidence. The district court rejected that claim and declined to certify it for appeal. When a state appeals a grant of habeas relief, our sister circuits are split on whether federal appellate courts have jurisdiction to hear a petitioner's arguments on cross-appeal about an alternative habeas claim that has not been certified. *Compare, e.g.*, *Sumpter v. Kansas*, 61 F.4th 729, 754 (10th Cir. 2023) (no jurisdiction absent proper certification), *and Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 474 (3d Cir. 2017) (same), *with Szabo v. Walls*, 313 F.3d 392, 397–98 (7th Cir. 2002) (certification is unnecessary). *Cf. Jennings v. Stephens*, 574 U.S. 271, 282–83 (2015) (acknowledging split but declining to decide whether a certificate is required for cross-appeals).

But we need not decide the issue here, as Hartman does not argue that he may make arguments beyond the two claims before us. So, he has abandoned any argument that we may assess his evidence-sufficiency claim. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006). At any rate, on the merits, we give full deference to state court interpretations of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Indeed, the Ohio appellate court noted several instances of force that sufficed to prove the "force" element of rape. *Hartman*, 64 N.E.3d at 536 (noting that Hartman pushed the victim onto the bed, removed her clothes, laid on top of her, and pulled her into the shower). Hartman does not argue that those specific events never occurred, which might have resulted in an unreasonable fact determination under § 2254(d)(2). He instead argues they can't qualify as force under Ohio law. That legal question is for Ohio courts to decide—and they have agreed that the evidence sufficed to prove the force element of rape.

that the Ohio appellate court had misapplied *Strickland*.  We disagree and reverse the district court's grant of habeas relief on the cross-examination claim.

Hartman claims that his trial counsel was unreasonable in introducing evidence of force during the cross examination of M.W.  He claims that, by doing so, his counsel helped the state satisfy its burden of proof.  The Ohio Court of Appeals determined that the state had introduced evidence of force during M.W.'s direct testimony.  It further determined that counsel had reasonably pursued an impeachment strategy during the cross-examinations.

The district court erred by failing to give AEDPA deference to those determinations.  Not only is an impeachment strategy reasonable, but it's often *advisable* when the trier-of-fact must assess competing witness testimony.  *See Harris v. New York*, 401 U.S. 222, 225 (1971) (characterizing impeachment as a "traditional truth-testing" device because it can provide "valuable aid" in assessing credibility).  The strategy's ubiquity underscores why not every fairminded jurist would agree that every reasonable lawyer would have acted differently.  *See id.*; *Dunn*, 594 U.S. at 740.  Counsel reasonably attempted to reveal inconsistencies and biases during cross-examination to help the judge assess M.W.'s credibility.  *See Strickland*, 466 U.S. at 690; *Harris*, 401 U.S. at 225.  Given the nature of the evidence—the judge had to weigh competing testimony in a "he said, she said" scenario—cross-examining a victim to call her credibility into question was not unreasonable even if it revealed new instances in which M.W. claimed Hartman used force.  A fairminded jurist could believe that the Ohio court correctly found that trial counsel pursued a valid trial strategy.  So AEDPA forecloses review of this claim.

In rejecting Hartman's separate sufficiency claim, the Ohio appellate court found that M.W.'s direct examination had revealed instances of force sufficient to prove each rape count. *See Hartman*, 64 N.E.3d at 536–38.  That determination does not conflict with the trial testimony.  M.W. *did* testify directly to the force Hartman used.  She said that when they entered the bedroom, "he pushed me onto the bed."  Trial Tr., R.7-1 at PageID 1217.  She described how he "took off my shirt and bra," then "took my pants off."  *Id.* at PageID 1217–18.  She explained that he "grabbed" her arm and "pulled" her into the shower.  *Id.* at PageID 1226–27.  Then, she

said, she went back to the bedroom, where he "pushe[d]" her "back onto the bed" and had sex with her one more time. *Id.* at PageID 1228.[5]

To be sure, trial counsel did elicit additional details of force—for instance, where Hartman touched or grabbed M.W. when he pushed her back on the bed—that do not appear in her direct examination. But counsel did so to emphasize inconsistencies in the statements M.W. had provided. For example, after M.W. said she felt restrained by Hartman's arm across her chest, counsel then parried with a question aimed at disproving the truth of that statement: "But when he was on top, you managed to get up in an effort to try and get away?" *Id.* at PageID 1263. Counsel also elicited that Hartman had held M.W. down by her wrists. But then counsel noted that she wasn't pointing to her wrists on the stand, instead pointing to her shoulders. And counsel also drew out M.W.'s statement to the nurse that she was kicking Hartman while he was taking off her clothes. But he got her to admit that she had not been yelling, as she had at first suggested in her statement. In sum, counsel's cross-examination sought to draw out certain inconsistencies in various statements and testimony M.W. had given about the assault. This strategy can help a factfinder assess truth, ulterior motives, possible biases, or prejudice. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Counsel's cross-examination of M.W., which elicited greater detail about the force Hartman used, ultimately failed. But Hartman's counsel did not introduce evidence of force out of whole cloth without any precursor in M.W.'s direct testimony. Under *Strickland*, a reasonable strategy could have been to impeach her testimony by introducing inconsistencies in the statements she had already provided even if it ultimately added new details to her testimony. *See* 466 U.S. at 690 (instructing courts to assess whether counsel has functioned to "make the adversarial testing process work"). An impeachment strategy serves a fundamental purpose within the adversarial process: helping judges and juries test a witness's truth by providing them

---

[5]At oral argument, Hartman's counsel correctly noted the Ohio appellate court found it "at least arguable" that the state had presented evidence of force on the third count during M.W.'s direct examination. Counsel then argued the state made no such finding for the first and second counts. In fact, the Ohio court found it "at least arguable" that the state had proved force on "*at least one* of the Rape counts—the last one occurring on the bed." *Hartman*, 64 N.E.3d at 542 (emphasis added). The court did not find that the state failed to present evidence on the earlier counts. Review of the opinion's evidence-sufficiency discussion reveals that the court found M.W. had testified to the use of force for each of the three counts. *See id.* at 536–37. That testimony came from her direct examination. *See id.* at 536.

the opportunity to assess the "possible biases, prejudices, or ulterior motives of the witness." *Davis*, 415 U.S. at 316; *see also Harris*, 401 U.S. at 225.  The Ohio court reasonably determined that counsel pursued exactly that strategy during M.W.'s cross-examination.

Hartman also argues that his trial counsel was unreasonable in failing to object to evidence of M.W.'s character elicited from her friend and in cross examining the friend about how out of character it would be for M.W. to have engaged in sexual conduct.  The Ohio court held that the trial judge could admit the friend's testimony about M.W.'s character under caselaw allowing such statements where they provide "additional support for the truth of the facts" in the victim's testimony or assist "the fact finder in assessing" truthfulness.  *See Hartman*, 64 N.E.3d at 543 (quoting *State v. Sedgmer*, 2002-Ohio-1527, at ¶ 23 (Ohio Ct. App. 2002)).  We do not review state courts' application of state law.  *See Estelle*, 502 U.S. at 67–68.  Counsel cannot have been ineffective for failing to object to admissible evidence.  This determination, then, cannot provide Hartman with a basis for relief.

Further, the Ohio court determined that the friend's cross-examination advanced a valid trial strategy.  During the friend's direct testimony, she said she was surprised that M.W. had spent the night with Hartman.  During cross-examination, Hartman's counsel confirmed with the friend that she was surprised about M.W.'s conduct.  And then counsel tried to impeach the friend's testimony by referencing a contradictory statement: "Except that you believed" that M.W. "was going to hook up with" Hartman "the night before[,] right?"  Trial Tr., R.7-1 at PageID 1338.  The strategy may not have elicited a damaging response, but the strategy's failure does not mean it was deficient.  *See Strickland*, 466 U.S. at 689 (admonishing courts to avoid second-guessing trial strategy only because it failed).  The testimony supported a strategy to discredit M.W.'s testimony that her encounter with Hartman was forced and nonconsensual.

Finally, Hartman faults his trial counsel for failing to object to hearsay statements that M.W. made to the detective.  The Ohio court rejected this argument.  In state court, the state conceded the statements were hearsay.  *Hartman*, 64 N.E.3d at 543.  But the Ohio court held Hartman had not been prejudiced because counsel made a strategic decision to allow the admission of inconsistent statements.  *Id.* at 544.  That finding was reasonable.  Indeed, left unsaid is the implicit conclusion that admission of those statements may have *bolstered*

Hartman's defense, making it more likely the factfinder might think M.W. had not been truthful. Counsel asked about M.W.'s contradictory statements about yelling, the amount of wine M.W. had drunk, the lack of bruising on her body from Hartman pulling her into the shower, and the "different ways" she said Hartman had held her down. Trial Tr., R.7-1 at PageID 1480, 1483, 1492. The strategy elicited "prototypical" impeachment testimony. *See Blackston v. Rapelje*, 780 F.3d 340, 353–54 (6th Cir. 2015); *Davis*, 415 U.S. at 315–16; *cf.* Fed. R. Evid. 608(b)(2). Counsel used one of the "traditional truth-testing devices of the adversary process." *Harris*, 401 U.S. at 225. To do so was not constitutionally deficient. Thus, the Ohio court's determination that Hartman could not show a "reasonable probability" that the result of the trial would have been different was not unreasonable. *See Strickland*, 466 U.S. at 694.

\*	\*	\*

Not only is it possible to identify reasonable strategies that Hartman's counsel pursued during cross-examination of the key witnesses, but the Ohio court has provided the primary one—impeachment of the key witness—for us. Given the potential benefits of pursuing this strategy, not every fairminded jurist would agree that every lawyer would have acted differently. *See Dunn*, 594 U.S. at 740. The Ohio court did not unreasonably apply *Strickland*, so we reverse the district court's grant of a conditional habeas writ on Hartman's cross-examination claim.

## B.	Ineffective Assistance of Counsel in Advice to Waive Jury Right

Next, we turn to Hartman's jury-waiver claim. Hartman argues that his counsel misinformed him about his right to a jury trial and induced him to waive that right. Hartman says his attorney gave him false information about the judge, the trial, and the review process. The attorney general responds that, except for counsel's statement about the judge's children, counsel never misstated any material fact about either a jury trial or the review process, so his conduct was not deficient. Further, the attorney general argues Hartman cannot show a reasonable probability that he would have either opted for a jury trial or been acquitted upon invoking his jury-trial right. The district court denied relief.

The Ohio Court of Appeals determined that trial counsel's performance was not deficient under *Strickland*. Hartman fails to demonstrate that this determination was contrary to, or

involved an unreasonable application of, clearly established federal law or was based on unreasonable determination of facts, as he must under AEDPA. *See* 28 U.S.C. § 2254(d). We therefore affirm the district court.

Hartman's claim depends on the application of *Strickland*'s ineffective-assistance standard to the context of advising Hartman to waive his right to a jury trial, a waiver that must itself be knowing, voluntary, and intelligent. *See Fitzpatrick v. Robinson*, 723 F.3d 624, 639 (6th Cir. 2013). But Hartman does not argue here that his waiver was unknowing, involuntary, or unintelligent. Instead, he argues that counsel's assistance was so ineffective that it violated *Strickland*. The Supreme Court's decision in *Hill v. Lockhart* provides an analogous framework: there, the Court held that the ineffective-assistance standard applied when a habeas petitioner claimed his attorney gave him erroneous information about parole eligibility that made his guilty plea "involuntary." 474 U.S. 52, 56 (1985). We apply the same standard to ineffective-assistance claims about jury-trial waivers. *See Willis v. Smith*, 351 F.3d 741, 745–46 (6th Cir. 2003). And, as above, Hartman must meet AEDPA's magnified standard to show that the Ohio court applied *Strickland* objectively unreasonably. *See* 28 U.S.C. § 2254(d)(1). To succeed, he must show that the state court's determination constituted "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. While Hartman must satisfy both the performance and prejudice prong of *Strickland*, we need not "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697.

Hartman has failed to show his counsel performed deficiently under *Strickland*. The Ohio court found that, given the absence of record evidence indicating counsel's advice was unreasonable, counsel's jury-waiver strategy was sound. *See Hartman*, 2017-Ohio-7933 at ¶ 77. This determination was not an unreasonable application of *Strickland*. Hartman argues that his counsel made a factual error in his advice to Hartman by asserting that the judge had sons rather than daughters and would understand a "male's" point of view. While concerning, this mistake does not completely eclipse the other reasonable advice that counsel provided. For instance, counsel recognized that prevailing media coverage might tend to make members of the community less sympathetic to alleged male rapists. Counsel also believed the trial judge was

"fair" and that he had a "good relationship" with the judge. State Ct. Docs., R.5-2 at PageID 641. The outcome in this trial depended on the trier-of-fact assessing directly competing testimony dealing with inflammatory issues of sexual assault, consent, and the overconsumption of alcohol. With that understanding, counsel's advice to try the case to an impartial judge—whom we typically describe as "less prone to persuasion" by misleading testimony than a jury, *see United States v. Stepp*, 680 F.3d 651, 669 (6th Cir. 2012)—was well within the wide range of reasonable professional conduct guaranteed under *Strickland*. Hartman points to no misapplication of clearly established federal law, nor unreasonable misapprehension of fact, undermining the reasonableness of the state court's conclusion that counsel's advice as a whole met the standard we expect of a reasonably competent attorney.

Even assuming that counsel misstated some of the elements of a jury trial and omitted relevant information about evidentiary review, it is not this Court's place to demand perfect technical knowledge of a jury trial to ensure that a jury-trial waiver was knowing, voluntary, and intelligent. We have never required that defendants perfectly understand every element of the jury-trial right in order to properly waive it. *See United States v. Martin*, 704 F.2d 267, 273 (6th Cir. 1983). Instead, we ask only whether the defendant understands that "the choice he faces is to be judged by a jury composed of people from the community as opposed to having his guilt or innocence determined by a judge." *Fitzpatrick*, 723 F.3d at 639. Trial counsel need not explain the minutiae of conducting a bench or jury trial to provide constitutionally sufficient advice to waive a jury-trial right. By Hartman's own admission, the attorney's advice laid out exactly what we require under our caselaw. He explained Hartman had a "right to a jury trial." State Ct. Docs., R.5-2 at PageID 641. He presented Hartman's choice as being between a "bench trial versus a jury trial." *Id.* He explained that the ultimate result would be up to a judge. *Id.* And he advised that a jury trial would depend on "twelve uneducated people" agreeing with Hartman's "side" of the story. *Id.* Given how well the advice tracks the key inquiry we make into whether a waiver was knowing and intelligent, the Ohio court was not unreasonable in determining that counsel's performance was not deficient. Thus, we need not address *Strickland*'s prejudice prong. *See* 466 U.S. at 697.

\*     \*     \*

The Ohio court determined that counsel's advice that Hartman waive his right to a jury trial was reasonable. On appeal, Hartman fails to demonstrate that this conclusion was based on an unreasonable determination of fact or an unreasonable application of federal law. Because the Ohio court did not unreasonably apply *Strickland*, we affirm the district court's denial of habeas relief on Hartman's jury-waiver claim.

## IV.

We **REVERSE** the district court's grant of a conditional habeas writ on Hartman's cross-examination claim and **AFFIRM** the district court's denial of Hartman's jury-waiver claim. We **REMAND** with instructions to deny Hartman's petition for a writ of habeas corpus.